**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **EASTERN ELECTRIC CORP. OF NEW JERSEY,** | : | |
| | : | |
| Plaintiff | : | **CIVIL ACTION** |
| | : | |
| v. | : | |
| | : | |
| **SHOEMAKER CONSTRUCTION CO., <u>et al.</u>,** | : | |
| | : | |
| Defendants | : | **NO. 08-3825** |

---

**<u>MEMORANDUM</u>**

Pratter, J.                                                                                          August 21, 2009

The complications attendant to the procedural history of this litigation among the

contractors, subcontractors, and owners of a multimillion dollar condominium project in

Philadelphia rival the intricacies of the project itself.  However, because much of the procedure is

irrelevant to the pending motion for entry of default judgment, the Court will discuss here only

history relevant to this particular motion.

On August 12, 2008, Eastern Electric Corp. of New Jersey ("Eastern"), a subcontractor

on the condominium project, filed suit against the general contractor (Shoemaker Construction

Co.) and the project owners (1419 Tower L.P., Urban Residential, LLC, and Metropolitan

Housing Partners, LLC) alleging breaches of the construction contracts.  On January 15, 2009,

Shoemaker filed cross claims against 1419 Tower and Urban Residential.[1]

---

[1] The same date, Shoemaker filed a third-party complaint against VEF-VI – Tower 1419
Project GP, LLC and Christopher H. Martorella.  Shoemaker has since amended its third-party
complaint, and because the third-party Defendants failed to respond, the Clerk of Court entered
default on June 10, 2009.  The Court is not considering Shoemaker's motion to enter default
against VEF-VI and Mr. Martorella in this Memorandum.  That Shoemaker motion is addressed

Upon request from Shoemaker, the Clerk of Court entered default on April 7, 2009 against 1419 Tower and Urban Residential for failure to appear, plead or defend.  Shoemaker moved for entry of default judgment on May 8, 2009.  The Court ordered 1419 Tower and Urban Residential to respond to Shoemaker's motion on or before June 12, 2009.  Neither third-party Defendant responded to the motion.

For the reasons set forth below, the Court will grant Shoemaker's Motion for Entry of Default Judgment.

## I. Background

Shoemaker and 1419 Tower, an affiliate of Urban Residential, entered into a written contract (the "Contract") in January 2006 for the rehabilitation and conversion of an office building into a residential building (the "Project").  The office building, which is located at 1419 Locust Street in Philadelphia, was to be converted into a condominium containing 114 residential units.  Cross-claim ¶ 6; Ball Aff., Exhibit B.  According to the terms of the contract, Shoemaker was to perform construction work[2] for the Project as dictated by the plans and specifications provided by 1419 Tower.  Shoemaker submitted to 1419 Tower ("Owner") its final guaranteed maximum price ("GMP") for the Project on or about March 6, 2006, and 1419 Tower accepted.

_____

in a separate Memorandum and Order.

[2]The Contract refers to Shoemaker as the "Construction Manager."  The term standing alone does not describe the role as a Construction Manager on a particular project.  Sometimes a Construction Manager is an agent of the project owner, acting as an advisor.  Other times, the Construction Manager's role is much more akin to the conventional general contractor.  The distinction can make a significant difference in the legal duties and entitlements of various project participants.

This GMP was incorporated into the Contract by written Amendment No. 1.  Cross-claim ¶ 7; Ball Aff., Exhibit C.  Both parties agreed that Amendment No. 1 would reflect that the original GMP for the Project was $34,989,000, and the date of Substantial Completion of the Project was scheduled for July 31, 2007.  Cross-claim ¶ 8; Ball Aff. ¶ 6, Exhibit C.

Before entering into the contract with Shoemaker, 1419 Tower also entered into contracts with a number of design professionals.  1419 Tower named Handle Architects, LP ("Handel" or "Architect") the project architect, and 1419 Tower also contracted with Paul H. Yoemans, Inc. ("PHY"), Schirmer Engineering ("Schirmer"), The Kachele Group ("TKG"), and VDA Associates ("VDA").  Collectively, these companies are known as the "Owner's Design Team." The Owner's Design Team then created detailed drawings and specifications for the Project, which were presented to Shoemaker to facilitate construction of the Project.[3]  Cross-claim ¶¶ 9-13; Ball Aff. ¶ 7.

Next, Shoemaker, in accordance with the Contract and upon review and approval by the Owner, entered into a number of contracts with subcontractors.  These subcontractors included Eastern, A.T. Chadwick Service Co., Inc. ("Chadwick"), James J. Gory Mechanical Contracting, Inc. ("Gory"), and Wyatt, Inc. ("Wyatt").  Cross-claim ¶ 16; Ball Aff. ¶ 9, Exhibits D, E, F, and G.  In accordance with the terms of the subcontracts, each of the subcontractors agreed (1) to cooperate with Shoemaker regarding claims involving the Owner, (2) to be bound to Shoemaker in the same manner in which Shoemaker was bound to 1419 Tower pursuant to the Contract, and

---

[3]The significance of this is that, under Pennsylvania law, the project owner warrants to the contractor, Shoemaker, that the plans and specifications are accurate and complete, and suitable for use in construction work.  If the plans and specifications are deficient, as is alleged to be the case here, the additional costs incurred by the contractor as a result may entitle the contractor to additional compensation from the project owner.

(3) to be ruled by the decisions of a court of competent jurisdiction with respect to related pass-through claims.  See e.g., Ball Aff., Exhibit D ¶ 20.

In the months between February 2006 and October 2006, the Project was delayed by a number of problems, including issues with mechanical, electrical, plumbing, and sprinkler rise coordination; a loss of temporary power to the high rise portion of the building; unforeseen site conditions discovered in the clay tile lining of shaft walls; and mud slab removal.  Cross-claim ¶¶ 17-24.

In the months between October 2006 and August 2007, the Project was again delayed by a lengthy list of problems, including shaft in fill work, shaft remediation work for damaged clay tile, 1419 Tower's inability to process change orders in a timely fashion, design changes to the MEP work and pressure reducing valves ("PRV's"), design changes in the scope of the work for the elevator buffers, design changes to add a dual gas main, delays to the hoist removal, and allegedly Owner-initiated changes to customize and combine condominium units.  Cross-claim ¶¶ 25-32.

In early 2007, as the Project progressed, 1419 Tower was unable to process change orders.  Shoemaker worked with Owner to resolve the problem.  At Owner's request, on or about April 4, 2007, Shoemaker and Urban Residential entered into a new written agreement (the "Construction Agreement" or "Sub-Job Agreement") for the performance of the then-identified additional work and the changed work.  Cross-claim ¶ 28; Ball Aff. ¶ 12, Exhibit I.

In accordance with the Sub-Job Agreement, Urban Residential acknowledged Shoemaker's claim and the reservation of the right to an extension of time to complete the additional and changed work.  Also, the parties agreed that the schedule of requirements of the

Project would be relaxed.  Lastly, it was agreed that Shoemaker would use its best efforts to complete the low-rise portion of the building on or before July 31, 2007, and that Shoemaker would use its reasonable best efforts to complete the high rise portion prior to October 31, 2007. Cross-claim ¶ 28; Ball Aff. ¶ 13.  All change orders with respect to the Project issued on or before January 1, 2007 were issued under the Sub-Job Agreement.  Cross claim ¶ 28(e).

By September 2007, the July 2007 Substantial Completion date of the Project had come and gone and was pushed back to December 18, 2007.  This was as a result of multiple prior delays that Shoemaker claims occurred through no fault of its own or any of the subcontractors it hired.  The December deadline was predicated on accelerating the remaining work in the hopes of achieving the Temporary Certificate of Occupancy by October 12 and conveying units for occupancy before the end of 2007.  In order to meet these deadlines, parallel work had to be performed on multiple floors at once.  In the months from September to December, the subcontractors' available manpower and the rate of material deliveries could not support the accelerated schedule.  Due to additional delays that occurred between September and December, the projected Substantial Completion date again was pushed back to March 28, 2008.  Cross-claim ¶ 34; Ball Aff. ¶¶ 15-16.

In the months between December 2007 and March 2008, the Project was delayed again by a city mandated design change requiring the addition of a second Siamese Fire Department connection (the Owner's drawings and specifications showed only one such connection), and by delayed cabinet deliveries.  Cross-claim ¶ 36.

Notwithstanding the numerous delays, Shoemaker was able to obtain individual Certificates of Occupancy ("COs") for 33 units in the low rise portion of the building on January

17, 2008, and the final CO for the last unit in the high rise portion of the building on May 3, 2008.  Cross-claim ¶ 37; Ball Aff. ¶ 17.

The drawings and specifications prepared by, or on behalf of, 1419 Tower allegedly contained material deficiencies which have caused substantial delays to the Project and disruptions to the work of Shoemaker and its subcontractors.  Cross-claim ¶ 3b; Ball Aff.  ¶ 18.  Reportedly, there were numerous site conditions discovered during construction, which were not shown on the drawings and specifications prepared by the Owner, and which were unforeseeable to Shoemaker at the time the Contract was signed. Cross-claim  ¶ 38.  As a result, Shoemaker claims that its work was significantly disrupted and delayed under both the Contract and the Sub-Job Agreement.  Shoemaker's cost of performance also was greatly increased by the delays.  Ball Aff.  ¶ 19.  In addition, subcontractors have submitted delay and disruption claims to Shoemaker, which  subsequently submitted such claims to the Owner pursuant to the terms of the respective contracts.  Cross-claim  ¶ 39; Ball Aff.  20.

The unpaid balance of the contract price is $591,136, exclusive of interest.  Cross-claim ¶ 40; Ball Aff.  ¶ 24.  The remaining unpaid sums include Invoice No. 28 (dated August 15, 2008) in the amount of $358,426 and Invoice No. 29 (dated December 23, 2008) in the amount of $232,710.  Cross-claim  ¶ 40; Ball Aff.  ¶ 24.  1419 Tower has not objected to either of these invoices.

The unpaid balance of the contract price on the Sub-Job Agreement is $625,396, exclusive of interest.  Cross-claim  ¶ 41; Ball Aff.  ¶ 26. This is comprised of Invoice No. 6 (dated May 29, 2008) in the amount of $198,544,  Invoice No. 7 (dated July 14, 2008) in the amount of $145,301, and  Invoice No. 8 (dated December 23, 2008) in the amount of $281,551,

all of which remain unpaid. Cross-claim ¶ 41; Ball Aff. ¶ 26. As a result of the delays to the Project, Shoemaker has incurred additional subcontract change order costs in the amount of $260,117. Ball Aff. ¶ 20. Urban Residential has not objected to any of these invoices.

Additionally, Shoemaker and the subcontractors (Wyatt, Eastern, Chadwick, and Gory) submitted delay claims for $4,316,138. These claims have been submitted by Shoemaker to 1419 Tower and Urban Residential, but none has yet been paid. Shoemaker is seeking $1,066,845 for general conditions and $260,177 for time-related subcontract change orders. Eastern, Chadwick, Gory, and Wyatt have presented delay claims for, respectively, $1,872,280; $235, 999; $431, 703; and $449,134. Ball Aff. ¶ 22; Chadwick Aff. ¶ 6; Episcopo Aff. ¶ 6; Gory Aff. ¶ 7; Ostapowicz Aff. ¶ 7.

## II. Legal Standard

### A. Standard for Entry of Default Judgment Under Rule 55(b)(2)

Pursuant to the Federal Rules of Civil Procedure, once the clerk of court has entered a default, the party seeking the default then must apply to the court for entry of a default judgment. See Fed. R. Civ. 55(b)(2); Fehlhaber v. Indian Trials, Inc., 425 F.2d 715, 716 (3d Cir. 1970) (granting default judgment against a third-party defendant who did not file answers). Generally, the entry of a default judgment is disfavored because it has the effect of preventing a case from being decided on the merits. Thus, because a party is "not entitled to a default judgment as of right," the court must use "sound judicial discretion" in weighing whether or not to enter a default judgment. Prudential-LMI Commercial Ins. Co. v. Windmere Corp., 1995 U.S. Dist. LEXIS 9948 (E.D. Pa. July 14, 1995) (quoting 10 Wright, Miller & Kane, Federal Practice and

7

Procedure § 2685 (1983).

Before entering a default judgment, a court must consider a number of factors.  The Third Circuit Court of Appeals has condensed these factors into three main issues: "(i) whether the plaintiff will be prejudiced if the default is denied, (ii) whether the defendant has a meritorious defense; and (iii) whether the default was the product of defendant's culpable conduct." Spurio v. Choice Security Systems, Inc., 880 F. Supp. 402 (E. D. Pa. 1995) (citing United States v. $55,518.05 in U.S. Currency, 728 F.2d 192, 195 (3d Cir. 1995)); Chamberlain v. Giampapa, 210 F.3d 154 (3d Cir. 2000).[4]  A defendant's culpable conduct weighs heavily in the evaluation of whether to grant or set aside a default judgment.  Farnese v. Bagnasoco, 687 F.2d 761 (3d Cir. 1982).  Because the courts do not favor defaults, a party's culpable conduct can "not be inferred from the default but must appear independently" from the default.  Maaco Enters., Inc. v. Beckstead, 2002 U.S. Dist. LEXIS 23623, at *7 (E.D. Pa. Dec. 9, 2002).  If there is doubt as to the defendant's culpability, the Court should "err on the side of setting aside the default and reaching the merits of the case." Id at *9.

Once a default judgment has been entered, the well-pleaded, factual allegations of the complaint, except those relating to the damage amount, are accepted as true and treated as though they were established by proof. See Coastal Mart, Inc. v. Johnson Auto Repair, Inc., 2001 U.S. Dist. LEXIS 2645, at *7 (E.D. Pa. Mar. 14, 2001); See also U.S. ex rel. Motley v. Rundle, 340 F. Supp. 807, 809 (E. D. Pa. 1972) (citing Thomson v. Wooster, 114 U.S. 104, 114 (1884)).  While these well-pleaded allegations are admitted and accepted, "the Court need not accept the moving

---

[4]At times, the court adds a fourth factor, "the effectiveness of alternative sanctions," to this list.  Emcasco v. Sambrick, 834 F.2d 71, 74 (3d Cir. 1987).

party's legal conclusions or factual allegations relating to the amount of damages." Broadcast Music, Inc. v. Spring Mountain Area Bavarian Resort, Ltd., 555 F. Supp. 2d 537, 541 (E.D. Pa. 2008) (citing Comdyne I, Inc. v. Corbin, 908 F.2d 1142, 1149 (3d Cir. 1990)). A party's default does not suggest that the party has admitted the amount of damages that the moving party seeks. See Comdyne I, Inc. v. Corbin, 908 F.2d 1142, 1149 (3d Cir. 1990).

In considering the amount of damages or the truth of an averment of evidence, the Court may make its determination by conducting a hearing or by receiving detailed affidavits from the claimant. Durant v. Husband, 28 F.3d 12, 15 (3d Cir. 1994) (stating that, if necessary, the court may hold a hearing to assess damages); Amresco Financial I L.P. v. Storti, 2000 WL 284203 (E. D. Pa. Mar. 13, 2000) (noting that the entry of a default judgment with an award of damages is proper when such an award can be ascertained from detailed figures in evidence and affidavits). The Court is under no requirement to conduct an evidentiary hearing with testimony, but, rather, such a hearing "may be one in which the [court] asks the parties to submit affidavits and other materials from which the court can decide the issue." Moore's Federal Practice 3d § 55.32[2][c]. If no evidentiary hearing is held, the moving party "must present sufficiently 'detailed affidavits' to permit the court to apply the appropriate factors in awarding statutory damages." Universal City Studios v. Ahmed, 1993 U.S. Dist. LEXIS 14951, at *5 (E.D. Pa. Oct. 18, 1993).

Under Pennsylvania law there is no requirement that a damage calculation meet a standard of mathematical certainty. See J.W.S. Delavau v. E. Am. Transp. & Warehousing, 2002 PA Super 336, P39 (Pa. Super. Ct. 2002); see also Vrabel v. Commonwealth, 844 A.2d 595 (Pa. Cmwlth. 2004) (a party need not quantify damages to a mathematical precision). Rather, a reasonable calculation should be made by looking at the evidence and the affidavits submitted by

9

the moving party. See J & J Sports Prods. v. Roach, 2008 U.S. Dist. LEXIS 109055 (E.D. Pa. July 8, 2008); Kaczkowski v. Bolubasz, 421 A.2d 1027 (Pa. 1980).  If such a reasonable calculation can not be made from the evidence and affidavits, then a hearing may be held to better determine the appropriate calculations.  Bakley v. A & A Bindery, Inc., 1987 U.S. Dist. LEXIS 5546 (E.D. Pa. June 18, 1987) (explaining that a judge may order a hearing on damages when the evidence and affidavits are not sufficiently clear).

## III. Legal Analysis

### A. Upon Consideration of the Conventional Factors, Shoemaker's Motion Should be Granted

With respect to the first factor discussed above, a court must consider whether or not a plaintiff will be prejudiced if the default judgment is not granted.  A number of factors do *not* establish a sufficient amount of prejudice against the plaintiff to open a default judgment.  For example, a "delay in realizing satisfaction on a claim rarely serve[s]" to meet the necessary bar for granting a default.  Feliciano v. Reliant Tooling Co., 691 F.2d 653, 656-57 (3d Cir. 1982). Indeed, there even are means that can be used to rectify or alleviate the prejudice a non-defaulting party may suffer if the court does not grant a default judgment. Id at 657.  In this case, however, Shoemaker asserts that time is of the essence and the entry of a default judgment is necessary.  Shoemaker states that 1419 Tower and Urban Residential are being pursued by numerous other creditors and that "there is a very great likelihood that if the entry of default is delay[ed] or denied, [then] Shoemaker's rights... would be seriously prejudiced and perhaps extinguished." See Shoemaker's Memo. of Law in Support of Motion for Entry of Default

10

Judgment at 12.  No party has challenged Shoemaker's assertions in this regard, and the Court has no independent reason to doubt these assertions.

The second factor requires consideration of what, if any, meritorious defense has been offered by the defaulting party.  A meritorious defense is one which, "if established at trial, would completely bar plaintiff's recovery."  Momah v. Albert Einstein Medical Center, 161 F. R. D. 304, 307 (E. D. Pa. 1995) (citing Foy v. Dicks, 146 F. R. D. 113, 116 (E. D. Pa. 1993)). Our Court of Appeals requires that a party wishing to prove a meritorious defense allege specific facts that stretch "beyond [a] general denial," and the party cannot rest solely "on the mere recitation of the relevant statutory language or a phrase in the Federal Rules of Civil Procedure."  United States v. $55,518.05 in U.S. Currency, 728 F.2d 192 at 195-96.

In this case, 1419 Tower and Urban Residential never responded to Shoemaker's cross-claims.  They have not objected to any of  "the invoices for the contract balances on the Contract [or] the Sub-Job Agreement," all of which are well over 100 days old.  See Shoemaker's Memo. of Law in Support of Motion for Entry of Default Judgment at 13. Because 1419 Tower and Urban Residential have not asserted *any* defense, they certainly have not asserted a meritorious defense to Shoemaker's claims.

_____Third, a court must consider whether or not the default resulted from defendant's culpable conduct.  Culpable conduct relates only to "actions taken willfully or in bad faith."  Mike Rosen & Assocs., P.C. v. Omega Builders, 940 F. Supp. 115, 118 (E. D. Pa. 1996) (citing Gross v. Stereo Systems, Inc., 700 F.2d 120, 124 (3d Cir. 1983).  In Mike Rosen, a case that provides a useful example of how this factor operates, the plaintiff's attorney served the defendant, who he knew was represented by counsel, without defense counsel's permission and while counsel was

not present.  Id.  Thus, it was the conduct of the plaintiff's attorney, and not of the defendant, which led to the defendant's default.  Because courts would rather rule on the merits of the case rather than through a default judgment, and because the default was not caused by the defendant's actions, the court set aside the entry of default.  Id.

In this case, however, the Court finds no excuse or outside reason apart from Defendants' own conduct that Defendants have defaulted.  They have not responded to Shoemaker's cross-claims, and Shoemaker asserts in its Memorandum that it "served all pleadings, motions and other documents on SGR (Defendants' former attorneys) during the time that [SGR] represented 1419 Tower and Urban Residential," and then served documents directly on 1419 Tower and Urban Residential after they concluded their counsel's representation.  See Shoemaker's Memo. of Law in Support of Motion for Entry of Default Judgment at 13.  1419 Tower and Urban Residential have not engaged in the litigation process and have offered no reason for this failure or refusal.  The Court finds that this conduct qualifies as culpable conduct with respect to the entry of a default judgment – indeed, for the Court to conclude otherwise would be to reward the recalcitrant or the oppositional and uncooperative.

Although all three of the foregoing factors weigh in favor of granting Shoemaker's motion for entry of default judgment, our Court of Appeals also encourages a trial court to consider a fourth factor, whether or not alternative sanctions would be appropriate or sufficient in a default situation. Emcasco v. Sambrick, 834 F.2d 71 at 74.  In Emcaso, the Court of Appeals reversed the granting of a default judgment on the theory that entry of a default is to "be a sanction of last, not first, resort." Id at 75.  There, the district court did not address whether the plaintiff "would be prejudiced if the default judgment were vacated" nor did the court consider if

12

the answer set forth by the defendant could qualify as a meritorious defense.  Id at 74.  The only factor the court did consider was defendant's culpable conduct, noting its "failure to file an answer for more than six weeks after it was due."  Id at 75.  Because the district court so limited its scope of consideration, the Court of Appeals reversed.

The case presently at issue, however, differs significantly from Emcaso.  The Court has considered at length all three factors and has found that all of them weigh in favor of the granting of a default judgment.  Shoemaker has offered a concrete and credible explanation of how it would be prejudiced if the entry of default judgment was further delayed or denied; neither 1419 Tower nor Urban Residential has asserted *any* defense, much less a meritorious one.  In addition, the Court has found no justification for 1419 Tower and Urban Residential failing to respond to the Shoemaker claims.  Thus, without any response from either 1419 Tower or Urban Residential to Shoemaker's cross-claims, and with Shoemaker's timely concerns as to its rights vis-a-vis other creditors also pursuing 1419 Tower and Urban Residential, this Court has no alternative sanction but the entry of a default judgment.

## IV. Legal Calculation of Damages

In light of 1419 Tower and Urban Residential's material breach of contract, their deficient plans and specifications for the Project, and the unforeseen site conditions that arose (all as now established by way of the default), Shoemaker is entitled to contract damages.  According to the Pennsylvania Contractor and Subcontractor Payment Act ("CASPA"), Shoemaker is also entitled to an interest payment of 1% per month 1419 Tower and Urban Residential have failed to pay

past-due amounts, to a 1% per month fee for the wrongful withholding of payment, and to

expenses.  Based on the following findings, the Court will enter a default judgment for

Shoemaker and against 1419 Tower and Urban Residential in the amount of $5,685,130.  See Ex.

A (Summary of Damages).

### A. 1419 Tower and Urban Residential Have Breached Their Respective Contracts with Shoemaker.

To prove a breach of contract claim, "Pennsylvania law requires that a plaintiff allege:

'(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by

the contract, and (3) resultant damages.'"  Hopkins v. GNC Franchising, Inc., 288 Fed. Appx.

871, 873 (3d Cir. 2008) (quoting CoreStates Bank, N.A. v. Cutillo, 1999 PA Super 14, 723 A.2d

1053, 1058 (Pa. Super. 1999)); Chemtech Int'l v. Chem. Injection Techs., 170 Fed. Appx. 805

(3d Cir. 2006).[5]

The two contracts at issue between Shoemaker and the Owners are the Contract with

1419 Tower and the Sub-Job Agreement with Urban Residential.  See Ball Aff., Exhibit B,

Exhibit I.  The essential terms of the Contract and the Sub-Job Agreement are set forth within

each document, and the General Conditions which apply to the Contract also apply to the Sub-

Job Agreement.[6]  The payment terms for the Contract and the Sub-Job Agreement require that

---

[5] The courts in this District often split the first factor of the Third Circuit Court of Appeals' test into two parts "(1) the existence of a valid and binding contract to which the plaintiff and defendants were parties [and] (2) the contract's essential terms." Flynn v. LaSalle Univ., No. 97-4542, 1998 U.S. Dist. LEXIS 14077, at *11 (E.D. Pa. Sept. 9, 1998) (citing Gundlach v. Reinstein, 924 F. Supp. 684, 688 (E.D. Pa. 1996)).  The courts also add an additional factor, "that plaintiff complied with the contract's terms," making the test for a breach of contract a five-part test. Id.

[6] Paragraph 1.2 of the Sub-Job Agreement provides that the work under the Sub-Job Agreement will be performed pursuant to the terms and conditions of the Contract, except to the

the Owners make payments within 30 days of receipt of Shoemaker's invoices.  <u>See</u> Ball Aff.,

Exhibit B § 7.1.3.  Shoemaker has established that 1419 Tower and Urban Residential have

failed to make payments on either the Contract or the Sub-Job Agreement and that Shoemaker's

last invoices are now more than 100 days old. <u>See</u> Ball Aff. ¶ 24 & 26; Memo. of Law in Support

of Motion for Entry of Default Judgment at 13.  Shoemaker has incurred damages in the amount

of the unpaid invoices, in addition to interest and penalty interest due pursuant to the

Pennsylvania Contractor and Subcontractor Payment Act ("CASPA").


**1. Shoemaker is Entitled to Interest, Penalty Interest, Attorney's Fees and Expenses Under CASPA**

Under CASPA, Shoemaker is entitled to interest at 1% per month on unpaid invoice

amounts and penalty interest at 1% per month for the Owner's wrongful withholding of payment.

<u>See</u> 73 P.S. § 501, <i>et. seq.</i>  CAPSA requires that owners, in this case 1419 Tower and Urban

Residential, "shall pay the contractor strictly in accordance with terms of the construction

contract." 73 P.S. § 505(a).  When a contractor engages in substantial performance, it becomes

entitled to payment from the party or parties with which it contracted. <u>See</u> 73 P.S. § 504.

Shoemaker's performance under the contracts, and 1419 Tower and Urban Residential's failure

to pay for such performance, triggered an award of damages to Shoemaker which includes

interest on the amount owed to Shoemaker, penalty interest, attorney's fees, and expenses.  <u>See</u>

73 P.S. § 505(6) ("if any progress or final payment to a contractor is not paid within seven days

of the due date established in subsection (c) the owner shall pay the contractor, beginning on the

---

extent that the Sub-Job Agreement differs.  <u>See</u> Ball Aff., Exhibit I ¶ 1.2.

eighth day, interest at the rate of 1% per month"); § 512(b) (award of attorney's fees and expenses).

Because 1419 Tower and Urban Residential have delayed payments beyond the date established by CASPA ("20 days after the end of a billing period or 20 days after delivery of the invoice, whichever is later"), they must now pay interest of 1% per month or fraction of a month on the balance that is due. 73 P.S. § 505(c) & (d).  Moreover, since the Owners have improperly withheld compensation that was owed to Shoemaker for work it performed, 1419 Tower and Urban Residential must pay a penalty interest to Shoemaker at a rate of 1% per month on amounts due.  73 P.S. § 509(d).[7]

As discussed above, a contractor or subcontractor can recover penalty, attorney's fees and expenses when an owner fails to comply with its payment obligations as set forth in CASPA.  73 P.S. § 505.  CASPA states that:

> If arbitration or litigation is commenced to recover payment due under this act and it is determined that an owner... has failed to comply with the payment terms of this act, the arbitrator or court <u>shall award</u>, in addition to all other damages due, <u>a penalty equal to 1% per month of the amount that was wrongfully withheld.</u>

73 P.S. § 512(a) (emphasis added).  Since the facts have made clear that Shoemaker has not received payments on the invoices sent to 1419 Tower and Urban Residential pertaining to work it performed under the terms of the Contract and the Sub-Job Agreement, the court "shall award" the penalty in addition to other damages due.  <u>Id</u>.

Once a contractor has established its contractual relationship with owners and has shown

---

[7] They are also subject to the provisions of section 12 which relates to attorney's fees and other expenses.  <u>See</u> <u>infra</u> § IV.B.5.

the owners' breach of contract and the resulting damage, the contractor is then entitled to the

remedies of CASPA with respect to the unpaid invoices that 1419 Tower and Urban Residential

have failed to pay.  ILM Systems, Inc. V. Suffolk Constr. Co., Inc., 252 F. Supp.2d 151, 161-62

(E. D. Pa. 2002).   The Contract and the Sub-Job Agreement clearly fall within the CASPA, and

thus Shoemaker is entitled to interest, penalty interest, attorney's fees and expenses because of

1419 Tower and Urban Residential's failure to pay presented invoices.


### 2. The Failure of 1419 Tower and Urban Residential to Make Payments Under the Contract and the Sub-Job Agreement is a Material Breach of Contract, which Excuses Shoemaker's Performance

When, under a contractual duty, an owner is required to pay a contractor for its

performance in accordance with a law such as CASPA, "any nonperformance is a breach."  See

Restatement (Second) of Contracts, § 235.  According to the Third Circuit Court of Appeals, "for

a breach to be material, it must go to the essence of the contract."  Norfolk S. Ry. Co. v. Basell

USA Inc., 512 F.3d 86 (3d Cir. Pa. 2008).  It is well established that the failure to make payments

when they are due is a material breach of a construction contract which excuses a contractor from

further performance.  Northern Helix Co. v. United States, 455 F.2d 546 (Ct. Cl. 1972); United

States Fidelity & Guaranty Co. v. Robert Grace Contracting Co., 263 F. 283, 291-92 (3d Cir.

1920) ( "the well-settled principle that an abandonment of further performance by the person to

whom payment is due is justified on the ground that there has been a repudiation of the contract

on the part of the person from whom the payment is due, because of persistent refusals to pay

installments or other circumstances which indicate an inability or determination not to pay the

installments due, as well as future installments.")

17

A party who has materially breached, here 1419 Tower and Urban Residential, may not object if the other party refuses to perform its obligations under the contract and may not insist upon such performance.  See Ott v. Buehler Lumber Co., 541 A.2d 1143, 1145 (Pa. Super. 1998). If a breach constitutes a material failure of performance, as refusal to pay amounts due does, the non-breaching party (Shoemaker here) is discharged from liability under the contracts that have been breached.  See Hartman Plastics v. Star Int'l LTD-USA, 1998 U.S. Dist. LEXIS 417 (E. D. Pa. 1998); Oak Ridge Const. Co. v. Tolley, 504 A.2d 1343, 1347 (Pa. Super. 1985).  Since 1419 Tower and Urban Residential have failed to fulfill their contractual obligations by failing to make the payments that were due, they have materially breached the Contract and the Sub-Job Agreement.[8]  See Ball Aff., ¶ 24 & 26.  Accordingly, the material breach excuses Shoemaker from further performance and discharges it from liability under the Contract and Sub-Job Agreement.

### B. 1419 Tower and Urban Residential are Liable to Shoemaker for Damages for Delays to the Project Resulting from Deficiencies in the Plans and Specifications and from Unforeseen Site Conditions

Many of the plans and specifications provided to Shoemaker by 1419 Tower were, according to Shoemaker's unchallenged Complaint, deficient and caused resulting delays to the Project.  Because of the problems with the plans and specifications provided by the Owners, as well as related unforeseen site conditions, Shoemaker and its subcontractors supposedly suffered damages resulting from related delays.  Shoemaker and the subcontractors are entitled

---

[8] Of course, if there had been some kind of excuse for this neglect, these Owners certainly have failed or neglected to explain these facts to the Court.

compensation for these. <u>Pennsylvania Dept. Of Transp. v. James D. Morrissey for and on behalf of W. P. Dickerson and Son, Inc.</u>, 682 A.2d 9 (Pa. Commw. Ct. 1996) (noting that contractor is entitled to recover costs of delays resulting from incorrect and ambiguous specifications that were furnished by the owner).

### 1. 1419 Tower and Urban Residential are Liable to Shoemaker in Damages for Delays to the Project Resulting from Deficiencies in the Plans and Specifications

The execution of the Contract between Shoemaker and 1419 Tower and the execution of the Sub-Job Agreement between Shoemaker and Urban Residential impliedly represented to Shoemaker that (1) the drawings and specifications were accurate, complete and sufficient for the performance of the work and that (2) 1419 Tower and its agents (Handel, PHY, Schirmer, TKG, and VDA) would perform their obligations, as set forth in the Contract, in a reasonable and timely manner.  The accuracy of the specifications and the timely completion of work by 1419 Tower and its agents were to facilitate the performance of Shoemaker's obligations under the Contract.  Because the contractual obligations of 1419 Tower and Urban Residential were not fulfilled, they are liable to Shoemaker for damages.[9]

_____

[9] 1419 Tower and Urban Residential cannot rely upon an exculpatory clause to avoid liability for delay related costs.  Under the law as set forth in Pennsylvania, "[e]xculpatory clauses in a contract cannot be raised as a defense where (1) there is an affirmative interference by the owner, or (2) there is a failure on the part of the owner to act in some essential manner necessary to the prosecution of the work." <u>Coatesville Contractors & Engineers, Inc. v. Borough of Ridley Park</u>, 506 A.2d 862, 865 (Pa. 1986); <u>see also</u> <u>Henry Schenk Co. v. Erie County</u>, 178 A. 662 (Pa. 1935).  The owner will be liable for damages resulting from affirmative interference despite a contractual no-damage-for-delay clause.  <u>See e.g.</u>, <u>Grimme Combustion, Inc. v. Mergentime Corp.</u>, 595 A.2d 77, 82 (Pa. Super. 1991); <u>see also</u> <u>Commonwealth, State Highway & Bridge Authority (PennDOT) v. General Asphalt Paving Co.</u>, 46 Pa. Commw. 114 (Pa. Commw. Ct. 1979).

Shoemaker has pleaded , and 1419 Tower and Urban Residential have failed to deny,

According to Pennsylvania law, an owner impliedly warrants the accuracy and completeness of the plans and specifications that it furnishes to the Contract.  See Rhone Poulenc Rorer Pharmaceuticals, Inc. v. Newman Glass Works, 112 F.3d 695 (3d Cir. 1997).  The owner who breaches this obligation is liable for the costs incurred by the contractor as a result of delays or unsatisfactory work that occurs due to the inaccuracy in the owner's plans.  See id at 697.  As Pennsylvania's Commonwealth Court stated, "[i]t is well established that a contractor who performs according to detailed plans and specifications is not responsible for defects in the result."  Commonwealth Dep't of Transp. v. W. P. Dickerson & Son, Inc., 400 A.2d 930, 932, (Pa. Commw. 1979).  Specifically, a contractor is not liable for simply performing work in accordance with owner-issued design specifications.  A. G. Cullen Construction Co., Inc. v. State

facts which provide for recovery of delay damages under Pennsylvania law.  As is the case here, even where a contract purports to limit liability, owners such as 1419 Tower and Urban Residential will be liable for compensation for delays.  See e.g., Gaspirini Excavating Co. v. Pennsylvania Tpk. Comm'n, 409 Pa. 465, 187 A.2d 157 (1963) (explaining that an owner cannot insulate himself from a delay damage claim when the contractor relied on some essential representation by the owner);  Coatesville Contractors & Engineers, Inc. v. Borough of Ridley Park, 506 A.2d at 865 (delay caused by owner's failure to report site conditions); Acchione & Canuso, Inc. v. Commonwealth of Pennsylvania Dept. Of Transp., 461 A.2d 765 (Pa. 1983) (delay was caused by a failure to make a critical decision in a reasonable and timely manner); Commonwealth, Dep't of Highways v. S. J. Groves & Sons Co., 20 Pa. Commw. 526 (Pa. Commw. Ct. 1975) (fourteen week delay led to an increased cost of performance and contractor recovered delay damages including interest); James Corp., v. N. Allegheny School Dist., 938 A.2d 474 (Pa. Commw. Ct. 2007) (stating that a contractor is entitled to delay and acceleration damages resulting from owner interference).

Furthermore, Shoemaker and the Owner expressly created an exception to the no-damages-for-delay clause.  See Ball Aff., Exhibit B, Rider to the General Conditions of the Contract for Construction, ¶ 8.3.1.  In Section 8.3, the Rider states that Shoemaker shall be entitled to payment of additional general condition costs associated with any delay "if the delay was caused by a change in the scope of the Work which was initiated by the Owner." Id. Because the delays associated with the Project and the resulting additional general condition costs associated with those delays were Owner caused, Shoemaker may recover its general conditions costs under the express provisions of the contract.

System of Higher Education, 898 A.2d 1145, 1156-57 (Pa. Commw. 2006).  Design specifications describe in detail which materials are to be utilized and the manner in which the work is to be performed.  These specifications do not allow for meaningful discretion by the contractor or any deviations from the specifications provided.  Id.

The potential liability of an owner to a contractor who performs work in accordance with plans and specifications furnished by another party was addressed by the United States Supreme Court in United States v. Spearin, 248 U.S. 132 (1918) (noting that if the contractor is bound to build according to plans prepared by the owner, it will not be responsible for the consequences of defects in those plans.)  The Spearin court stated that the implied warranty of accuracy in the plans and specifications of the owner is not overcome by the general requirement that a contractor visit a site, review plans, or assume responsibility for the work until completion and acceptance.  Id at 136.  Pennsylvania law is in accord with the propositions set forth in Spearin. See e.g., Rhone Poulenc Rorer Pharmaceuticals, Inc., 112 F.3d at 697; Commonwealth Dep't of Transp. v. W. P. Dickerson & Son, Inc., 400 A.2d at 932.  Here, because Owner-issued design specifications caused Shoemaker's delays in Project completion, Shoemaker's delay is excusable, and 1419 Tower and Urban Residential are liable for the associated costs and delay damages. See .  Commonwealth Dep't of Transp. v. W. P. Dickerson & Son, Inc., 400 A.2d at 932.

### 2. 1419 Tower and Urban Residential are Liable to Shoemaker for the Delays and Damages Resulting from the Unforeseen Site Conditions

The Contract between Shoemaker and 1419 Tower expressly provides for additional compensation for concealed site conditions different from those indicated on the Contract Documents, provided that the conditions were not discoverable through a visual inspection.  See

Ball Aff, Exhibit B (Rider to the General Conditions of the Contract for Construction ¶ 4.3.6).

The purpose of such a clause is to make it unnecessary for the contractor to include large

contingencies in the contract price to deal with the potential for unanticipated adverse concealed

conditions in an existing structure.  5 BRUNER & O'CONNOR ON CONSTRUCTION LAW § 15:65

(2004).

Where, as here, concealed conditions are encountered that were not foreseen, and which

could not have been discovered by a visual site inspection,[10] the contractor is entitled to

compensation for the additional costs incurred.  Ace Constructors, Inc. v. United States, 70 Fed.

Cl. 253 (2006), aff'd, 499 F.3d 1357 (contractor entitled to recover additional costs for

acceleration of work and loss of productivity resulting from differing and unforeseen site

conditions);[11] Luria Bros. & Co. v. United States, 369 F.2d 701 (Ct. Cl. 1996) (contractor entitled

to recover additional costs incurred as a result of design changes which unreasonably delayed the

work to be performed).

### 3. 1419 Tower and Urban Residential are Liable to Shoemaker on the Pass-Through Claims Asserted by Shoemaker for the Benefit of its Subcontractors

Claims for a breach of contract must be asserted along the chain of contractual privity.

These types of claims are commonly referred to as "pass-through" claims. See Interstate

---

[10] See Ball Aff. ¶ 19.

[11] Ace Constructors, Inc. describes five requirements that must be proven to present a successful claim for constructive acceleration: "(1) excusable delay; (2) knowledge by the government of the delay; (3) a statement or act of the government that can be construed as an acceleration order; (4) notice by the contractor that the order is a constructive change (causation); and (5) incurrence of additional costs as a result of the acceleration." Ace Constructors, Inc. v. United States, 70 Fed. Cl. at 280.

Contracting Corp. v. City of Dallas, 135 S. W.3d 605 (Tex. 2004).  In Interstate Contracting, the

Texas Supreme Court defined a pass-through claim as one "(1) by a party who has suffered

damages... (2) against a responsible party with whom it has no contract... and (3) presented

through an intervening party...who has a contractual relationship with both." Id at 610.  See also

W. G. Tomko, Inc. v. Bd. of Pub. Edu., 2005 Pa Dist. & Cnty. Dec. Lexis 367 (Pa. Comm. Pl. Ct.

2005) (citing Interstate Contracting with approval and stating that pass-through claims are widely

accepted in the construction industry).  According to Pennsylvania law, pass-through claims are

also referred to as "use and benefit" claims.  See James, Julian, Inc. v. Com. Dept. of Transp.,

2003 WL 23358060 (Pa. Bd. Claims 2003) (awarding damages to contractor "for the use and

benefit" of subcontractor); Marisco Corp. v. Com. State System of Higher Education, 2004 WL

2372054 (Pa. Bd. Claims 2004) (same); Glasgow, Inc./The Nyleve Co. v. Com. Dept. Of Transp.,

1995 WL 789935 (Pa. Bd. Claims 1995) (same).

     For a pass-through claim to exist, there must be an agreement between the contractor and

the subcontractor.  North Moore Street Developers, LLC v. Meltzer/Madl Architects, P.C., 23 A.

D.3d 27, 30 (N.Y. App. Div. 2005) ("[a] liquidating agreement is a valid mechanism for bridging

the privity gap between owners and subcontractors who sustain damages as the result of the

actions of other persons"); 3 Bruner & O'Connor on Construction Law § 8: 51 (2004); See e.g.,

Barry, Bette, and Led Duke, Inc. v. State of New York, 240 A. D.2d 54 (N.Y. App. Div 3d Dep't

1998) (noting that there is no one specific form that a liquidating agreement must follow, but

rather it can be in the subcontract or in some separate agreement).

     In this case, Shoemaker may assert claims on behalf of its subcontractors (Eastern,

Chadwick, Gory and Wyatt) on a pass-through basis because Shoemaker and the subcontractors

expressly allowed for such claims through the subcontract.  The subcontracts between

Shoemaker and its subcontractors include a liquidating agreement that states that the:

> Subcontractor agrees to be bound to the Contractor to the same
> extent the Contractor is bound to the Owner by any final decisions
> of [Owner's representative] or of a Court of competent jurisdiction
> ...whether or not Subcontractor is a party to such proceedings.

See e.g., Ball Aff. Exhibits E, F, G at ¶ 20.  According to the terms of this clause, Shoemaker's

subcontractors may recover their damages for any non-payment against the Owner only to the

extent that Shoemaker recovers on the claims it has asserted.  Under the terms of this liquidating

agreement, Eastern, Chadwick, Gory Contracting and Wyatt have entered into a pass-through

agreement with Shoemaker, and thus, they are bound by the Court's decisions for any non-

payment that occurs on the part of 1419 Tower and Urban Residential.


### 4. Shoemaker is Entitled to Prejudgment Interest at the Legal Rate of 6% for its Delay Related Claims Against 1419 Tower and Urban Residential

Shoemaker is entitled to receive interest at the legal rate of 6% for all of its delay related

claims.  See 41 P.S. § 202.  Pennsylvania case law has established that prejudgment interest is

awarded as a matter of right.  Somerset Comm. Hospital v. Allan B. Mitchell & Assocs., 685

A.2d 141 (1996) (citing Thomas H. Ross Inc. v. Seigfried, 405 Pa. Super. 558, 592 A.2d 1353

(1991)).  According to the Pennsylvania Supreme Court,

> For over a century it has been the law of this Commonwealth that
> the right to interest upon money owing upon contract is a legal
> right. West Republic Mining Co. v. Jones & Laughlins, 108 Pa. 55
> (1885). That right to interest begins at the time payment is withheld
> after it has been the duty of the debtor to make such payment.

Fernandez v. Levin, 548 A.2d 1191, 1193 (Pa. 1988).  There is no requirement that damages

must be liquidated in order to receive prejudgment interest, and there is also no exception to a party's right to prejudgment interest simply because the amount of damages must be determined at trial.  Spang & Co. v. USX Corp., 599 A.2d 978, 984 (Pa. Super, 1991) (noting that because defendant could have known the amount of his debt and did not pay it, he delayed litigation and deprived plaintiff of a certain portion of damages).  Cf. Daset Mining Corp. v. Industrial Fuels Corp., 473 A.2d 584, 595 (Pa. Super. 1984) ("in claims that arise out of a contractual right, interest has been allowed at the legal rate from the date that payment was wrongfully withheld, where the damages are liquidated and certain, and the interest is readily ascertainable through computation.")  The premise underlying the award of prejudgment interest centers on the fact that the breaching party has deprived the injured party of using the interest accrued on money it was owed.  Somerset Hospital, 685 A. 2d at 148.  Accordingly, Pennsylvania statutory law provides that an injured party who is owed a sum of money as a matter of right may recover prejudgment interest at "the rate of interest of six per cent per annum."  41 P. S. § 202.

Shoemaker performed under the Contract, so payment for its performance was due according to the terms of the Contract from 1419 Tower and Urban Residential.  Because these Owners have failed to pay,[12] Shoemaker has been deprived of interest on such funds.  Thus, pursuant to Pennsylvania law, the Court will award Shoemaker damages at the rate of 6% on its delay-related claims against 1419 Tower and Urban Residential.

### 5. Shoemaker is Entitled to Attorney's Fees Pursuant to the Contract and the Sub-Job Agreement

Again, according to Pennsylvania law, a party can recover its attorney's fees when there

---

[12]  Ball Aff., ¶ 24 & 26

is an express statutory authority or a clear agreement to that effect between the parties in dispute.

See Fidelity-Philadelphia Trust Co. v. Philadelphia Transp. Co., 173 A.2d 109, 114 (Pa. 1961);

Chatham Communications, Inc. v. General Press Corp., 344 A.2d 837, 842 (Pa. 1975) (noting

that in the absence of a statutory authority or an agreement between the parties, there can be no

recovery of attorney's fees).  In this case, Shoemaker and the Owners placed an express provision

in the Contract and the Sub-Job Agreement that states that Shoemaker is entitled to recover

attorney's fees incurred during this action.  Specifically, the Contract states:

> If any action at law or in equity or arbitration is necessary to enforce or interpret the
> terms of this Agreement, the prevailing party shall be entitled to recover all out-of-
> pocket costs and expenses, including attorney's fees, from the other party, in addition
> to any relief to which it may be entitled.

See Ball Aff., Exhibit B (Rider to the General Conditions of the Contract for Construction, ¶

13.9).  Accordingly, Shoemaker is entitled to attorney's fees to be taxed by the court pursuant to

Federal Rule of Civil Procedure 54(d).

     With respect to the award of attorney's fees, the "substantially prevailing party in any

proceeding to recover any payment under this act shall be awarded a reasonable attorney fee in an

amount to be determined by the court or arbitrator, together with expenses."  73 P.S. § 512(b).

Pennsylvania courts have described a substantially prevailing party as "a party in whose favor a

judgment is rendered, regardless of the amount of damages awarded."  Zavatchen v. RHF

Holdings, Inc., 907 A.2d 607, 610 (Pa. Super. Ct. 2006) (citing Profit Wize Mktg. v. Wiest, 2002

PA Super 380 (Pa. Super. Ct. 2002)).  As Shoemaker notes in its Memorandum of Law, sections

507 and 512(b) do not contain exceptions such as a "good faith exception," but rather "provide

that a party is entitled to interest, fees and costs with respect to all payments found to be due to it

under [CASPA]." F.S.I., Inc. v. Viola Contrs., Inc., 2003 U.S. Dist. LEXIS 1288 *10 (E. D. Pa. Jan 21, 2003).

In order to award attorney's fees, however, a court must review records of the basis for such fees, including a detailed work summary along with "(1) the full name of each attorney who worked on each discrete task...;' (2) the qualifications and experience of each of those attorneys; and (3) an explanation of how the hourly rates used in the...calculations were chosen." Moravian Assocs., L.P. v. Henderson Corp., 2008 U.S. Dist. LEXIS 62260, at *41 (E.D. Pa. Aug. 12, 2008).  Prior to awarding attorney's fees, the court should possess "sufficient information to determine the reasonableness of the hourly rate and the number of hours expended in defending the litigation." Id.  With this in mind, a court may delay an awarding of attorney's fees until it has the necessary documents for review.

Although the Court finds that Shoemaker is entitled to attorney's fees, the Court cannot make an award at this time.  The Court does not have information regarding the number of hours expended on this litigation by specific attorneys, nor has the Court been presented with evidence concerning the reasonableness of hourly rates.  In the Order accompanying this Memorandum, the Court will grant the parties an opportunity to brief the issue of attorney's fees and to provide necessary documentation.

**IV.     CONCLUSION**

The Court will enter default judgment against 1419 Tower L.P. and Urban Residential,

LLC in the amount of $5,685,130, as specified in the Summary of Damages included as Exhibit

A to this Memorandum and in the accompanying Order.


BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

28

**Exhibit A**                                                                                    **Summary of Damages**

| Element of Damage | Description | Amount | Invoice Date | Payment Due | Days Late as of 5/1/09 | CASPA Interest through 5/1/09 | CASPA Penalty Interest through 5/1/09 |
|---|---|---|---|---|---|---|---|
| Base Job Contract Balance | Invoice No. 28 | $358,426 | 8/15/08 | 9/14/08 | 229 | $26,985 | $26,985 |
| | Invoice No. 29 | $232,710 | 12/23/08 | 1/22/09 | 99 | $7,574 | $7,574 |
| | Sub-Total | $591,136 | | | | $34,559 | $34,559 |
| | CASPA Interest through 5/1/09 | $34,559 | | | | | |
| | Penalty Interest through 5/1/09 | $34,559 | | | | | |
| | Total Judgment | $660,224 | | | | | |
| | | | | | | | |
| Sub Job Contract Balance | Invoice No. 6 | $198,544 | 5/29/08 | 6/28/08 | 307 | $20,039 | $20,039 |
| | Invoice No. 7 | $145,301 | 7/14/08 | 8/13/08 | 261 | $12,468 | $12,468 |
| | Invoice No. 8 | $281,551 | 12/23/08 | 1/22/09 | 99 | $9,164 | $9,164 |
| | Sub-Total | $625,396 | | | | $41,671 | $41,671 |
| | CASPA Interest through 5/1/09 | $41,671 | | | | | |

| Element of Damage | Description | Amount | Invoice Date | Payment Due | Days Late as of 5/1/09 | CASPA Interest through 5/1/09 | CASPA Penalty Interest through 5/1/09 |
|---|---|---|---|---|---|---|---|
| | Penalty Interest through 5/1/09 | $41,671 | | | | | |
| | Total Judgment | $708,738 | | | | | |
| | | | | | | | |
| **Element of Damage** | **Description** | **Amount** | | | | | |
| Delay Claims | Shoemaker General Conditions | $1,066,845 | | | | | |
| | Shoemaker Time Related Subcontr. Change Orders | $260,177 | | | | | |
| | Eastern | $1,872,280 | | | | | |
| | Chadwick | $235,999 | | | | | |
| | Gory Contracting | $431,703 | | | | | |
| | Wyatt, Inc. | $449,134 | | | | | |
| | Total Judgment | $4,316,138 | | | | | |
| | | | | | | | |
| | **Total** | $5,685,130 | | | | $76,213 | $76,231 |